**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**PATRICK S. RICE,**

    **Plaintiff,**

                                 **Civil Action 2:20-cv-4641
                                 Judge Michael H. Watson**

    **v.**                                **Magistrate Judge Chelsey M. Vascura**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB"). This matter is before the undersigned for a Report and Recommendation ("R&R") on Plaintiff's Statement of Errors (ECF No. 16), the Commissioner's Memorandum in Opposition (ECF No. 18), and the administrative record (ECF No. 13). For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability determination and **REMAND** this case pursuant to Sentence 4 of § 405(g).

## I.      BACKGROUND

Plaintiff filed an application for DIB in 2018, alleging that he became disabled on June 1, 2011. (R. at 167–73, 174–80.) Plaintiff's application was denied initially in May 2018, and upon reconsideration in July 2018. (R. at 64–75, 77–88.) A video hearing was held on September 6, 2019, before an Administrative Law Judge ("ALJ"), who issued an unfavorable determination on October 1, 2019. (R. at 34–63, 12–33.) The Appeals Council declined to review that unfavorable determination, and thus, it became final. (R. at 1–6.)

Plaintiff seeks judicial review of that final determination.  He alleges that the ALJ erred when evaluating medical opinion evidence from his treating physician, Dr. Brian Higgins.  (ECF No.16, at PageID # 1858–66.)  The undersigned finds that Plaintiff's claim has merit.

## II.    THE ALJ DECISION

The ALJ issued her decision on October 1, 2019, finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 12–33.)  The ALJ initially found that Plaintiff's date last insured under the Act was December 31, 2016.  (R. at 17.)  At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since June 1, 2016, the alleged date of onset, through the date last insured of December 31, 2016.  (R. at 17.)  At step two, the ALJ found that Plaintiff had the following

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

  1. Is the claimant engaged in substantial gainful activity?

  2. Does the claimant suffer from one or more severe impairments?

  3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

  4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

  5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

severe impairments: 1) morbid obesity; 2) degenerative disk disease; 3) status post spinal fusion; 4) status post-right knee arthroscopy; and 5) a respiratory disorder. (*Id*.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.) Before proceeding to step four, the ALJ determined Plaintiff's RFC, as follows:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except that the claimant could never climb ladders, ropes, or scaffolds and only occasionally stoop, kneel, crouch and crawl. The claimant could frequently balance and he could tolerate occasional exposure to and/or work around vibration, fumes, gases and other pulmonary irritants. The claimant could never work around hazards such as moving machinery or unprotected heights.

(R. at 18.) At step four, the ALJ relied on testimony from a vocational expert ("VE") to determine that Plaintiff could not perform his past relevant work as foundry worker-general because that job required duties precluded by his RFC prior to his date last insured. (R. at 27.) The ALJ therefore concluded Plaintiff was not disabled under the Social Security Act. (*Id*.)

### III.    RELEVANT RECORD EVIDENCE

#### A.    Plaintiff's Testimony

At the September 26, 2019 video hearing, Plaintiff, who was represented by counsel testified to the following. Plaintiff previously worked as a relief and maintenance man at a metal foundry. (R. at 40.) He stopped working in 2011 because he had back surgery. (R. at 40–41.) Specifically, Plaintiff had an L5-S1 decompression in June 2011, but his symptoms did not improve. (R. at 48.) Since his surgery, Plaintiff's doctors performed tests and injections to "see about [his] nerves," but they were unsuccessful. (R. at 50.) Doctors also recommended that Plaintiff receive a stimulator implant and advised him to lose weight so that another back surgery

3

could be performed by going through his stomach.  (*Id*.)  Plaintiff did not, however, want to have another back surgery, and he regretted the surgery he had undergone.  (*Id*.)  He had, however, undergone bariatric surgery in January 2019.  (*Id*.)  A doctor had reviewed a post-fusion MRI and told Plaintiff that it "looked like the screws were not holding."  (R. at 52.)

Plaintiff also had right knee surgery to repair his meniscus.  (R. at 52.)  Since that surgery, Plaintiff's knee had "want[ed] to go out more often" and he had to brace his right knee against a cabinet if he had been, for instance, standing to do dishes.  (*Id*.)

Plaintiff's doctors had also recommended that Plaintiff use a cane to walk because of his balance and numbness in his leg, and he had used a cane since the 2011 surgery.  (R. at 50–51.)  Since the surgery, Plaintiff's right lower thigh would go completely numb if he stood too long or sat in certain positions and he would get burning pins and needles in his leg.  (R. at 51.)  He also had edema and swelling in his leg if he had stood for too long and he had to sit and elevate his legs to get the swelling to go down.  (R. at 51–52.)  He had purchased a shower stool so he did not have to stand too long when showering and an extra-high bar stool for in front of his sink so he could alternate between sitting and standing while doing dished.  (R. at 53.)  He purchased these items in 2012 and had been using them since.  (*Id*.)  He estimated that he could walk about 30 feet, stand for about 10 minutes, and sit for 10-to-15 minutes.  (R. at 54.)  He also normally elevated his legs two-to-three times a day for about 15 to 20 minutes.  (*Id*.)

Plaintiff had previously applied for Social Security disability benefits but had been denied and did not appeal.  (R. at 47.)  Instead, he lived on annuity money that he inherited when his father passed away and by selling his belongings.  (R. at 48.)

**B.    Medical Records**

**1.    Treatment Records Before the Alleged Date of Onset (June 1, 2011)**

Records from Plaintiff's physician, Dr. Higgins, reflect that Plaintiff received epidural steroid injections on March 22 and April 5, 2011, after Plaintiff complained of low-back pain secondary to disc with radicular symptoms. (R. at 793, 791.) Dr. Higgins wrote that if things did not improve, he would seek a surgical consult. (R. at 791, 792.)

In April and May 2011, Plaintiff sought treatment from Dr. Paul Degenova, for low-back and right leg pain that he had been experiencing for about three months. (R. at 313–114, 312–13.) He had a positive straight-leg test on the right and an antalgic gait. (R. at 312.) He had mild tenderness to palpitation along his lumbar spine but no long track marks. (*Id*.) An MRI showed grade I spondylolisthesis L5-S1 with a herniated disk L5-S1 on the right and acute radiculopathy. (*Id*.)

**2.    Treatment Records After the Alleged Date of Onset (June 1, 2011) and Before the Date Last Insured (December 31, 2016)**

On June 3, 2011, Plaintiff underwent a transforminal lumbar interbody fusion, Gill type decompression, posterior spinal fusion, and placement of an interbody device at the L5-S1 levels of his lumbar spine. (R. at 265, 267–69, 319–21, 590, 595–96.) Dr. Degenova wrote that Plaintiff tolerated the procedure well and there were no complications. (R. at 321.) On June 8, 2011, Plaintiff went to the ER because his incision appeared to be "coming apart." (R. at 329.) On June 10, 2011, Plaintiff had drainage from his wound. (R. at 310.)

At a June 24, 2011 appointment with Dr. Higgins, Plaintiff reported that his surgery with Dr. Degenova had improved his leg pain but he was still having pain and discomfort in his back around his right hip. (R. at 677.) Dr. Higgins wrote that Plaintiff's motor and sensory were intact to the lower extremities, and his gait and transfers were intact. (*Id*.) However, Plaintiff

had some drainage around his incision, tenderness primarily on the right, decreased lumbar range of motion, and 0/4 deep tendon reflexes.  (*Id*.)

On July 15, 2011, Plaintiff had drainage from his wound, and it was not healing as rapidly as hoped.  (R. at 309.)  As a result, Plaintiff underwent an irrigation and debridement procedure on July 21, 2011.  (R. at 317–18.)  At an August 5, 2011, appointment, Plaintiff reported to Dr. Degenova that he was "feeling a lot better" since the irrigation and debridement although he still had some low-back pain.  (R. at 308.)  Upon examination, Plaintiff's wound was intact, there was no sign of infection, and his neurosensory status was intact.  (*Id*.)  He was prescribed physical therapy, his medications were continued, and he was told to return in one month.  (*Id*.)

August 31, 2011, lumbar imaging showed screw and bar fixation at Plaintiff's L5-S1.  (R. at 430.)  There was slight biconcave appearance to Plaintiff's L5 vertebral body, but the remaining posterior elements appeared unremarkable.  (*Id*.)

On October 4, 2011, Plaintiff reported to a colleague of Dr. Degenova's that he did not receive much benefit from physical therapy and that he continued to have low-back pain.  (R. at 306.)  Plaintiff had a guarded tandem walk that was slow and shuffling in nature, and he was unable to perform a toe or heel walk secondary to pain.  (*Id*.)  He was also unable to lay supine for a significant period of time, and therefore, it was difficult to assess a straight-leg raising test. (*Id*.)  Plaintiff demonstrated, however, intact motor function to the L5 to S1 nerve roots of the bilateral lower extremities with 5/5 strength.  (*Id*.)  In addition, there was no paravertebral muscle spasms or atrophy upon inspection of his lower back.  (*Id*.)  X-rays of Plaintiff's lower back also showed a well fused L5-S1 junction with adequate bone graft consolidation on the lateral masses of the L5-S1 junction.  (*Id*.)

At an October 7, 2011 appointment, Dr. Higgins found that Plaintiff's motor and sensory to the lower extremity was intact, he was negative on a Pelvic rock test, and he had fair transfers from sit to stand and reverse.  (R. at 676.)  Dr. Higgins also found, however, that Plaintiff had tenderness about his right sacroiliac joint and positive Patrick's and Yeoman's tests on the right.  (*Id*.)  He had extension to neutral and flexion to about 45°.  (*Id*.)  Dr. Higgins noted that Plaintiff had a limp favoring the right when he ambulated and that he looked uncomfortable.  (*Id*.)

Dr. Higgins examined Plaintiff on December 9, 2011, and found that he had no focal atrophy and 5/5 on manual muscle testing.  (R. at 675.)  But Plaintiff had decreased sensation in the anterolateral aspect of his right thigh, possibly in the L3 dermatome.  (*Id*.)  There was also a question of deceased sensation to pinprick in the L4 dermatome medially.  (*Id*.)  In addition, Plaintiff had +1 pretibial edema, decreased lumbar range of motion, and tenderness in the mid lumbar spine.  Dr. Higgins instructed Plaintiff to elevate his legs to help his edema.  (*Id*.)

A December 9, 2011 MRI of Plaintiff's lumbar spine showed fixation at L5-S1 with degenerative disk and endplate findings.  (R. at 431.)  He had less than grade 1 anterolisthesis L5 on the sacral base, minimal concentric bulging at L4-L5 and L5-S2, and no focal protrusion or gross stenosis.  (*Id*.)

On December 15, 2011, Dr. Higgins wrote that Plaintiff had diminished sensation in the L3 dermatome on the right and possibly the L4 dermatome.  (R. at 674.)  He also has some pretibial edema and shortness of breath at rest.  (*Id*.)

At a January 27, 2012 appointment with Dr. Degenova, Plaintiff reported that "terrible" pain radiated down his right leg and into his testicles but that his back was worse than his leg.  (R. at 305.)  He further indicated that his leg pain was the same as it had been but that his back pain had worsened since surgery.  (*Id*.)  Plaintiff had a very antalgic gait and trouble moving

around, but his wound looked excellent, an MRI showed no untoward signs, and his instrumentation was in good position.  (*Id*.)

Dr. Higgins' records reflect that a February 8, 2012 EMG of Plaintiff's right lower extremity showed evidence of a right L5-S1 radiculopathy.  (R. at 828–30, 673.)

On March 16, 2012, Dr. Higgins examined Plaintiff and noted a well healed surgical incision in the lumbar spine.  (R. at 672.)  A seated straight-leg raising test was negative.  (*Id*.)  But Plaintiff had tenderness in the lower lumbar spine, diminished sensation to light touch in the lower right extremity, and his deep tendon reflexes were +2/4 in his knees and 0/4 in his ankles.  (*Id*.)  He also favored his right leg when walking.  (*Id*.)   Dr. Higgins recommended that Plaintiff try caudal epidural steroid injections.  (*Id*.)  Dr. Higgins also referred Plaintiff for an evaluation for a spinal cord stimulator.  (*Id*.)

At an examination on May 1, 2012, Dr. Higgins found that Plaintiff had decreased sensation in the lower right extremity.  (R. at 669.)  Plaintiff also had tenderness in the lower lumbar spine and his deep tendon reflexes were +1/4 in the knees and 0/4 in the ankles.  (*Id*.)  A seated straight-leg raising test was, however, negative.  (*Id*.)

Dr. Higgins examined Plaintiff on June 7, 2012, and found that he had +3/4 pretibial edema about halfway up his left leg and +1/4 edema on the right leg. (R. at 671.)  Straight-leg raising on the right increased Plaintiff's back and right leg pain.  (*Id*.)  His deep tendon reflexes were 0/4 for his ankles and 1/4 for his knees.  (*Id*.)

On August 7, 2012, Dr. Higgins examined Plaintiff and found that he had tenderness in the lower lumbar spine bilaterally.  (R. at 670.)  Plaintiff had intact motor and sensory in the lower extremities but +3/4 pitting edema on the right.  (*Id*.)  After reviewing diagnostic testing and imaging, Dr. Higgins concluded that Plaintiff was neurologically stable.  (*Id*.)

At a September 18, 2012 appointment with Dr. Higgins, Plaintiff reported that his facet joint injections were not effective. (R. at 840.) Dr. Higgins wrote that upon examination, Plaintiff appeared more comfortable than he did previously. (*Id.*) He also noted that Plaintiff walked with a cane, had tenderness in the lower lumbar spine, and had +1/4 edema in the pretibial region. (*Id.*) Straight-leg raising was, however, negative and Plaintiff's motor and sensory were intact to the lower extremities. (*Id.*) Plaintiff was advised to continue taking pain medication and encouraged to continue to be active. (*Id.*) Dr. Higgins wrote that Plaintiff "may use his cane for safety." (*Id.*)

Records from a November 13, 2012 appointment with Dr. Higgins indicate that Plaintiff saw Dr. Swain and that a trial spinal cord stimulator was being planned for him. (R. at 845.) Upon examination, Dr. Higgins found that Plaintiff had no edema, cyanosis, or clubbing; his gait was intact without loss of balance; his lumbar range of motion was limited in all directions; and there was tenderness to palpitation in the lower lumbar spine and bilateral sacroiliac joints. (*Id.*) Dr. Higgins wrote that Plaintiff looked uncomfortable. (*Id.*)

An MRI of Plaintiff's lumbar spine on December 4, 2012, showed what appeared to be a laminectomy at L5-S1. (R. at 573.) It also showed scar tissue just below the exiting L5 nerve root on the right side at the beginning of the neural foramen. (*Id.*) Vertebral bodies were in normal alignment and bone marrow was normal. (*Id.*) Pedicle screws at L5 and S1 appeared to be in satisfactory position. (*Id.*)

Plaintiff sought treatment on February 1, 2013, for low-back pain that radiated all the way down his right leg. (R. at 303.) A physical examination by a doctor who practiced with Dr. Degenova found that Plaintiff was grossly neurovascularly intact in the lower bilateral extremities with no focal neurological deficits. (*Id.*) A recent MRI was reviewed that showed

Plaintiff's hardware from his previous surgery. (*Id.*) Although the radiologist noted that the L5 screw could be in contact with the S1 nerve root on the right side, that was not seen by the reviewer. (*Id.*) But due to the right radicular pain and the "questionable" screw, a CT scan was ordered for further evaluation. (*Id.*)

A CT lumbar spine scan on February 25, 2013, showed that Plaintiff was post posterior lumbar spinal fusion and decompression laminectomies at L5-S1 but that no adverse features of the orthopedic hardware were identified. (R. at 571.) There was grade 1 anterolisthesis of L5 relative to S1 and a pseudo-bulge resulting in moderate right and mild left neural foraminal narrowing. (R. at 571–72.) There was also disk bulge at L3-L4 without significant spinal canal stenosis or neural foraminal narrowing. (R. at 572.)

At a February 25, 2013, appointment with Dr. Higgins, Plaintiff reported that he was working part time with restrictions and that although physical therapy did not help, his medications were helping. (R. at 764.) Upon examination, Dr. Higgins found that Plaintiff had no edema; his motor strength was 5/5; his sensation to light touch, coordination, and transfers were all intact; his reflexes were normal; and he was negative for straight-leg seating tests. (R. at 764–65.) Plaintiff also had no atrophy or masses, full ranges of motion in his lumbar spine and lower extremities. (R. at 764.) But Plaintiff had tenderness in the paraspinal muscles primarily on the right. (*Id.*) He also had a limp on the right although his station was intact. (*Id.*)

On March 26, 2013, Dr. Higgins wrote that Plaintiff had no edema; his motor strength was 5/5; his sensory and reflexes were normal; and his coordination, transfers, gait, and station were all intact. (R. at 762.) He also had no tenderness or atrophy. (*Id.*) Plaintiff's lumbar range of motion was decreased in flexion and extension, but he had full range of motion in his lower

extremities. (*Id.*) A seated straight-leg raising test also produced back and right buttock pain. (R. at 762–63.)

On April 10, 2014, Plaintiff sought treatment for respiratory problems. (R. at 604.) A physical examination found new right knee pain and that Plaintiff's knee was tender to touch and move. (R. at 605.) Imaging on Plaintiff's right knee that same day showed no fracture or dislocation and that Plaintiff's joint spaces were generally maintained. (R. at 438.) April 22, 2014 X-rays of Plaintiff's knees showed moderate narrowing of the medial joint compartments bilaterally, but more extensive on the right, and spurring at the right lateral tibia spine. (R. at 440.) An ultrasound that day was negative for DVT. (R. at 441.)

An April 19, 2013 lumbar myelogram showed that Plaintiff was post fusion at the L5-S1. (R. at 566, 769.) He had no change in spondylolisthesis at that level and that there was otherwise normal alignment, and no significant extradural defect on the thecal sac. (*Id.*) A CT scan of Plaintiff's lumbar spine that day also showed status post fusion at L5-S1 with grade 1 spondylolisthesis and no disk protrusion or stenosis. (R. at 566, 770.)

During examinations on April 26, and May 31, 2013, Dr. Higgins found that Plaintiff had +1 edema in the bilateral lower extremities. (R. at 759, 757.) Plaintiff's motor strength was 5/5; his sensory and reflexes were normal; and his coordination, transfers, gait, and station were all intact. (*Id.*) He had no tenderness or atrophy in April, but had tenderness in the bilateral lumbar paraspinal muscles in May. (R. at 760, 757.) Although Plaintiff's lumbar range of motion was decreased in all directions, he had full range of motion in lower extremities. (*Id.*) In April he was negative for a seated straight-leg raising test, but was positive on the left in May. (*Id.*)

At an appointment with a doctor who practiced with Dr. Degenova on May 31, 2013, Plaintiff indicated that he had gained over 100 pounds in the last year. (R. at 301.) He was very

lethargic and had difficulty getting around the room and he had tenderness to palpitation in the middle of the spine. (*Id*.) Plaintiff also walked with a slow antalgic gait but he was able to walk on his toes and on his heels. (*Id*.) His bilateral symmetric deep tendon reflexes were +2/4 and he had no long track signs. (*Id*.) He had 5/5 strength in his hip flexors, knee extensors, ankle plantar, and dorsiflexors. (*Id*.) A CT myelogram was basically normal other than a grade I slip that was fused. (*Id*.) The CT scan and previous X-rays also showed that Plaintiff's hardware was stable and had appropriate construct. (*Id*.) Plaintiff was told that given that the MRI and CT myelogram were normal, there really was no surgical option. (*Id*.) Plaintiff expressed an interest in getting a spinal cord stimulator. (*Id*.)

On August 23, 2013, Dr. Higgins's examination found that Plaintiff had +2 edema in his bilateral lower extremities. (R. at 754.) But an examination on December 27, 2013, found that Plaintiff had no edema. (R. at 752.) At both visits, Plaintiff's motor strength was 5/5 and his sensory was intact to light touch, however, his reflexes were only +1/4. (R. at 754, 752.) Plaintiff's coordination, transfers, gait, and station were all intact. (*Id*.) He had tenderness with deep palpitation in the lower lumbar paraspinal area, but no atrophy. (*Id*.) Although Plaintiff's lumbar range of motion was decreased in all directions, he had full range of motion in lower extremities. (*Id*.) A seated straight-leg raising test was negative bilaterally. (*Id*.)

On February 10, March 24, May 22, and June 24, 2014, Plaintiff had no edema. (R. at 749, 747, 745, 742.) Plaintiff's motor strength was 5/5 and his sensory was light collection intact in the lower extremities, however, his reflexes were only +1/4. (*Id*.) Plaintiff's coordination was intact, and his transfers were "independent" or "he needed no assistance or boosting." (*Id*.) In February, Plaintiff's station was intact with his shoulders over his hips. (R. at 749.) In March, May, and June, his station demonstrated good posture. (R. at 747, 745, 742.) At all four

examinations, however, Dr. Higgins found that with regard to gait, Plaintiff favored his right lower extremity. (R. at 749, 747, 745, 742.) Plaintiff also had tenderness in the lumbar paraspinal muscles bilaterally, but no atrophy. (*Id*.) Although Plaintiff had a full range of motion in the lower extremities, his lumbar range of motion was decreased in all planes and directions secondary to discomfort. (*Id*.) Seated straight-leg raising tests were negative bilaterally. (*Id*.)

On July 25, 2014, Plaintiff underwent a right knee arthroscopy with medial meniscectomy to treat degenerative joint disease and a meniscus tear. (R. at 354–55.)

Plaintiff had +2 pretibial edema on December 10, 2014. (R. at 736.) His motor strength was 5/5 and his sensory was light collection intact in the lower extremities, however, his reflexes were only +1/4. (*Id*.) In addition, Plaintiff's coordination was intact, and his transfers were independent. (*Id*.) Plaintiff's station also demonstrated good posture, but Plaintiff continued to favor his right lower extremity. (*Id*.) Dr. Higgins also noted that Plaintiff was using a cane following a recent knee surgery. (R. at 736.) Plaintiff also had tenderness in the lumbar paraspinal muscles bilaterally, but no atrophy. (R. at 736.) And although Plaintiff had a full range of motion in his lower extremities, his lumbar range of motion was decreased in all planes and directions secondary to discomfort. (*Id*.) Seated straight-leg raising tests were negative bilaterally. (R. at 737.)

Dr. Higgins examined Plaintiff eight times during 2015 and 2016. During all of those examinations, Plaintiff had no edema. (R. at 733, 730, 727, 724, 722, 719, 716, 712.) In addition, Plaintiff always had 5/5 strength in his lower extremities. (*Id*.) At a number of those examinations, however, Plaintiff had 4/5 strength in his right tricep. (R. at 727, 724, 722, 719, 716, 713.) He also had decreased sensation in the right thigh during all of those examinations

(R. at 733, 730, 727, 724, 722, 719, 716, 713) and decreased sensation in the C7 dermatome on the right during some of them (R. at 727, 724, 722, 719). Although Plaintiff's coordination was always intact, his reflexes were only +1/4 in his bilateral lower extremities. (R. at 733, 730, 727, 724, 722, 719, 716, 712, 713.) His transfers were also independent during most of these examinations, (R. at 733, 730, 727, 724, 722), but Dr. Higgins found that he had to boost with his hands/arms at a few of them, (R. at 719, 716, 713). Plaintiff also had tenderness bilaterally in the lower lumbar spine and reduced lumbar range of motion in all directions secondary to discomfort. (R. at 734, 730, 727–28, 725, 722–23, 720, 717, 713.) But he had full range of motion in the lower extremities and seated straight-leg raising tests were negative. (*Id.*) Plaintiff never had any atrophy. (R. at 734, 730, 728, 725, 722, 720, 717, 713.) Dr. Higgins found that Plaintiff demonstrated good posture with regard to his station. (R. at 734, 730, 727, 724, 722, 720, 717, 713.) At most of these examinations, however, Dr. Higgins noted that with regard to gait, Plaintiff walked favoring the right lower extremity and used a cane (R. at 734, 730, 727, 724, 722, 720.) During two examinations, Dr. Higgins found that with regard to gait, Plaintiff favored his left leg. (R. at 717, 713.)

A March 14, 2016 musculoskeletal examination found that Plaintiff had tenderness. (R. at 611.) Plaintiff also exhibited slow ambulation. (*Id.*) An examination on March 30, 2016, found that he had lumbar and knee tenderness with ambulation and palpitation. (R. at 614.) During an examination on April 14, 2016, Plaintiff again had slow ambulation. (R. at 617.) On April 27, 2016, an examination showed that Plaintiff had slow position changes and ambulation due to weight gain. (R. at 620.) An examination on May 10, 2016, found that Plaintiff had a slow steady gait. (R. at 623.) On May 24, 2016, he had normal range of motion but exhibited tenderness in the lumbar region. (R. at 626.)

PA-C Buck, a Physician Assistant who worked with Dr. Higgins, examined Plaintiff on June 14, 2016. (R. at 709–10.) Plaintiff had 5/5 motor strength in his lower extremities but 4/5 strength in his right bicep, decreased sensation in the right lateral thigh, and +1/4 reflexes in the knee and ankle. (*Id*.) Plaintiff also had tenderness in the bilateral spinal area, and a straight-leg raising test increased his low-back pain but not his leg pain. (R. at 710.) But Plaintiff had no edema that day and no atrophy. (R. at 709.) And although discomfort limited Plaintiff's lumbar range of motion, he had full range of motion in the lower extremities, and no tenderness in the SI joint or the piriformis. (R. at 710.) Plaintiff's station demonstrated good posture. (*Id*.) With regard to gait, however, he favored his left leg. (*Id*.) Dr. Higgins cosigned PA-C Buck's notes. (R. at 711.)

An examination on July 15, 2016, found that Plaintiff had 1-2+ edema in the lower extremities and grossly normal strength and range of motion. (R. at 396.)

On August 23, 2016, Plaintiff sought ER treatment for redness and swelling in his right leg that had started three days prior. (R. at 473, 478.) X-rays revealed no fracture or dislocation (R. at 473, 493), and an ultrasound was negative for DVT (R. at 491–92). Upon examination, Plaintiff had normal range of motion but erythema, right lower extremity edema, warmth, and pain. (R. at 479–80.) Plaintiff was diagnosed with cellulitis. (R. at 473.) Wound cultures also revealed sepsis. (R. at 500.) Plaintiff was admitted to the hospital and treated with antibiotics. (*Id*.) His blood pressure was also treated with Hyzaar, labetlol, and clonidine with excellent results and almost complete resolution of his edema. (*Id*.) Plaintiff was released on August 28, 2016. (R. at 499.) He was instructed to elevate his lower extremities and to refrain from physical activities for the next day or two, especially cutting grass because that could impact his shins. (*Id*.)

PA-C Buck examined Plaintiff again on September 14, and December 19, 2016.  (R. at 706–08, 703–05.)  At both appointments, Plaintiff had +1 edema bilaterally.  (R. at 706, 703.) PA-C Buck also found that Plaintiff had 5/5 motor strength in his lower extremities but 4/5 strength in his left bicep, decreased sensation in the right lateral thigh, and +1/4 reflexes in the knee and ankle.  (R. at 704, 707.)  At both visits, Plaintiff's station also demonstrated good posture.  (R. at 704, 707.)  But on September 14, 2016, PA-C Buck wrote that with regard to gait, Plaintiff that had a slightly shortened stance on the right.  (R. at 707.)  On December 19, 2016, PA-C Buck wrote that Plaintiff he had a slightly shortened stance phase on the left.  (R. at 704.) Dr. Higgins co-signed PA-C Buck's notes.  (R. at 708, 705.)

### 3.  Assessment from State Agency Consultative Examiners and Reviewers

Plaintiff's file was reviewed at the initial level by Abraham Mikalov, M.D. on May 8, 2018.  (R. at 71–73.)  Dr. Mikalov found that Plaintiff could perform light work (i.e., that Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand and/or walk six hours in an eight-hour workday; and sit six hours in an eight-hour workday).  (R. at 71.)  Dr. Mikalov also found that Plaintiff could frequently balance; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, and scaffolds.  (R. at 72.)  Dr. Mikalov last found that Plaintiff needed to avoid hazards such as unprotected heights and operating heavy machinery.  (R. at 73.)  Plaintiff's file was reviewed at the reconsideration level on July 5, 2018, by Diane Manos, M.D., who made the same findings.  (R. at 83–86.)

### IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V.     ANALYSIS

As noted, Plaintiff alleges that the ALJ erred when she evaluated the July 31, 2019 medical opinion from Dr. Higgins. The undersigned agrees.

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1) (2012). A claimant's RFC assessment must be based on

all the relevant evidence in a his or her case file.  *Id*.  The governing regulations[2] describe five

different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other

medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical

findings.  20 C.F.R. §§ 404.1513(a)(1)-(5); 416.913(a)(1)–(5).  With regard to two of these

categories—medical opinions and prior administrative findings—an ALJ is not required to

"defer or give any specific evidentiary weight, including controlling weight, to any medical

opinion(s) or prior administrative finding(s) including those from [the claimant's] medical

sources."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, an ALJ must use the following

factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2)

"[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other

factors, such as "evidence showing a medical source has familiarity with the other evidence in

the claim or an understanding of [the SSA's] disability program s policies and evidentiary

requirements."  §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5).  Although there are five factors,

supportability and consistency are the most important, and the ALJ must explain how they were

considered.  §§ 404.1520c(b)(2); 416.920c(b)(2).  And although an ALJ may discuss how he or

she evaluated the other factors, he or she is not generally required to do so.  *Id*.  If, however, an

ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-

supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ must]

articulate how [he or she] considered the other most persuasive factors . . . . . " §§

404.1520c(b)(3); 416.920c(b)(3).

---

[2]  Plaintiff's application was filed after March 27, 2017.  Therefore, it is governed by revised
regulations redefining how evidence is categorized and evaluated when an RFC is assessed.  *See*
20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017).

In addition, when a medical source provides multiple opinions, the ALJ need not articulate how he or she evaluated each medical opinion individually.  §§ 404.1520c(b)(1); 416.920c(b)(1).  Instead, the ALJ must "articulate how [he or she] considered the medical opinions . . . from that medical source together in a single analysis using the factors listed [above], as appropriate." *Id.*

In this case, the ALJ analyzed the July 31, 2019 Treating Spine and Rehab Specialist form that Dr. Higgins completed and concluded that Dr. Higgins' opinions were not persuasive. The ALJ wrote:

> I have considered the opinion provided by Dr. Brian Higgins for the period prior to the claimant's date last insured, December 31, 2016 . . . . I find Dr. Higgins' opinion is not persuasive as it is not well supported and is inconsistent with the medical evidence prior to the claimant's date last insured.  Dr. Higgins' opinion was issued in a form provided by the claimant's representative . . . .  In support of his opinion, Dr. Higgins cited the claimant's subjective reports of fatigue, lower extremity numbness, and increased pain with movement . . . .  In addition, in reaching the conclusion that the claimant would require several unscheduled breaks during the day, Dr. Higgins relied on the claimant's subjective reports of fatigue and pain, not clinical findings.  Dr. Higgins' opinion is also inconsistent with the medical evidence.  In Dr. Higgins' opinion, the claimant had to elevate his legs above waist height for twenty to thirty per cent of a typical eight-hour day . . . .  While the exams in the record prior to the claimant's date last insured showed edema in his lower extremities on occasion, there is no indication in the record that Dr. Higgins or any of the claimant's other treatment providers recommended the claimant elevate his legs throughout the day.  Dr. Higgins also opined that the claimant would require several unscheduled breaks during a typical day due to weakness and fatigue . . . .  However, other than 4/5 strength in his right biceps, Dr. Higgins exams and the other exams in the record prior to his date last insured consistently showed the claimant had normal motor strength in all areas . . . .  In addition, while Dr. Higgins concluded the claimant could not stand or walk for more than two hours out of an eight-hour day since 2016, none of the exams in the record showed any signs of muscle atrophy in any area and the imaging of the claimant's lumbar spine showed a solid fusion in his lumbar spine after surgery.  Lastly, I find the opinions provided by the state agency medical consultants are more persuasive than Dr. Higgins' opinion because they are well supported and consistent with the medical evidence prior to December 31, 2016 . . . .

(R. at 25.)

The undersigned finds that the ALJ erred when analyzing Dr. Higgins' opinions. The ALJ concluded that Dr. Higgins' opinions lacked support because Dr. Higgins supported his opinions by citing the claimant's subjective reports of fatigue, lower extremity numbness, and pain worse with movement. (R. at 25.) But the ALJ's conclusion lacks substantial support because it inaccurately describes the Treating Spine and Rehab Specialist form Dr. Higgins completed. (R. at 1176.) That form asked Dr. Higgins to list Plaintiff's symptoms. (R. at 1176.) In response to that request, Dr. Higgins wrote: "low back pain, lower extremity numbness and edema, easy fatigability, and pain worse with movement." (*Id.*) But when asked to identify the clinical findings and objective signs that supported the severity of Plaintiff's symptoms, Dr. Higgins wrote, "limited range of motion, difficulty standing or walking, morbid obesity, effusion left knee, x-rays 11/2015 shows solid fusion L5-S1or L4-L5." (*Id.*) It therefore appears that the ALJ overlooked Dr. Higgins' response to the question asking him to identify clinical findings and objective signs and failed to analyze if Dr. Higgins' examination notes, which evidenced the findings and signs that Dr. Higgins cited.

The ALJ also concluded that Dr. Higgins' opinion was inconsistent with the medical evidence. Specifically, Dr. Higgins opined that Plaintiff needed to elevate his legs above waist height for twenty-to-thirty percent of a typical eight-hour day. (R. at 1177.) The ALJ concluded that this opinion was inconsistent with the record evidence because "there [was] no indication in the record that Dr. Higgins or any of [Plaintiff's] other treatment providers recommended that [. . . Plaintiff] elevate his legs throughout the day." (R. at 25.) This conclusion lacks support because it is belied by the record. Dr. Higgins examined Plaintiff on December 9, 2011, and instructed him to elevate his legs to help his edema. (R. at 675.) In addition, Plaintiff was

instructed to elevate his lower extremities when he was released from the hospital on August 28, 2016, after being treated for edema, cellulitis, and sepsis.  (R. at 499.)

In addition, the ALJ concluded that Dr. Higgins' opinion about walking and standing limitations were inconsistent with the medical evidence.  The ALJ explained that Dr. Higgins opined that Plaintiff "could not stand or walk for more than two hours out of an eight-hour day since 2016," but "none of the exams in the record showed any signs of muscle atrophy in any area and the imaging of the claimant's lumbar spine showed a solid fusion in his lumbar spine after surgery."  (R. at 25.)  It is true that Dr. Higgins' examinations regularly found that Plaintiff had no atrophy, (*see* R. at  675, 764, 762, 760, 757, 754, 752, 749, 747, 745, 742, 736, 734, 730, 728, 725, 722, 720, 717, 713, 709), and that an X-ray of Plaintiff's lumbar spine showed a well-fused L5-S1 junction after Plaintiff's surgery, (R. at 306 ).  But that is not all that Dr. Higgins' examinations found.  Dr. Higgins' examinations also routinely found that Plaintiff had issues with regard to his gait.  For example, on March 16, 2012, Dr. Higgins found that Plaintiff favored his right leg when walking.  (R. at 672.)  At an examination on September 18, 2012, Dr. Higgins told Plaintiff that he could use a cane for safety.  (R. at 840.)  On February 10, March 24, May 22, and June 24, 2014, Dr. Higgins found that Plaintiff favored his right lower extremity.  (R. at 749, 747, 745, 742.)  At examinations in 2015 and 2016, Dr. Higgins noted that Plaintiff walked favoring the right lower extremity and used a cane.  (R. at 734, 730, 727, 724, 722, 720.)  On February 11, and April 7, 2016, Dr. Higgins found that Plaintiff favored his left leg.  (R. at 717, 713.)  PA-C Buck examined Plaintiff on June 14, 2016, and found that with regard to gait, Plaintiff favored his left leg.  (R. at 710.)  On September 14, 2016, PA-C Buck wrote that with regard to gait, Plaintiff had a slightly shortened stance on the right.  (R. at 707.)

On December 19, 2016, PA-C Buck wrote that Plaintiff had a slightly shortened stance phase on the left. (R. at 704.) Dr. Higgins co-signed PA-C Buck's notes. (R. at 711, 708, 705.)

Other treatment providers likewise made findings with regard to Plaintiff's gait. On October 4, 2011, a colleague of Dr. Degenova's found that Plaintiff had a guarded tandem walk that was slow and shuffling in nature and he was unable to perform a toe or heel walk secondary to pain. (R. at 306.) On January 27, 2012, Dr. Degenova noted that Plaintiff had a very antalgic gait and trouble moving around. (R. at 305.) On May 31, 2013, Dr. Degenova wrote that Plaintiff walked with a slow antalgic gait. (R. at 301.) On March 14, 2016, Plaintiff exhibited slow ambulation. (R. at 611.) An examination on March 30, 2016, found that Plaintiff had lumbar and knee tenderness with ambulation and palpitation. (R. at 614.) During an examination on April 14, 2016, Plaintiff again displayed slow ambulation. (R. at 617.) On April 27, 2016, an examination showed that Plaintiff had slow position changes and ambulation due to weight gain. (R. at 620.) On May 10, 2016, Plaintiff's gait was steady but slow. (R. at 623.)

In this case, the ALJ appeared to find it significant that Plaintiff had no atrophy and that imaging showed a solid post-surgical fusion in his lumbar spine. (R. at 25.) But the ALJ failed to explain why those findings meant that Plaintiff would not have difficulty standing or walking as opined by Dr. Higgins. This is problematic, especially in light of the numerous record references to Plaintiff's gait issues. In short, it is simply unclear from the ALJ's opinion if she considered the totality of the examination findings in the record, especially to the extent they may have been consistent with Dr. Higgins' opinion that Plaintiff could not stand or walk for more than two hours out of an eight-hour day.

For these reasons, the undersigned finds that Plaintiff's allegation of error has merit— the ALJ erred when considering Dr. Higgins' opinion.

## VI.    RECOMMENDED DISPOSITION

Based on the foregoing, the undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner's non-disability determination and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this R&R.

## VII.    PROCEDURE ON OBJECTIONS

If any party objects to this R&R, that party may, within fourteen (14) days of the date of this R&R, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a *de novo* determination of those portions of the R&R or specified proposed findings or recommendations to which objection is made. Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the R&R.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE